LAKESIDE BRIDGE & STEEL COMPANY *v.* DUVALL.

Opinion delivered July 1, 1929.

J. B. Ward, for appellant.

Edward Gordon and Robert Bailey, for appellee.

BUTLER, J. The appellant, Lakeside Bridge & Steel Company, was engaged in constructing a nine-mile section of Highway No. 105 north from Atkins, and this suit was brought against it by the appellee, Duvall, for damages for alleged breach of contract, and a verdict was rendered in his favor for the sum of $500. The evidence was to the effect that he had made an oral contract with one Ray Hundley, who he alleged to be plaintiff's superintendent, by which he was given the contract to haul sand, rock, cement, and other materials to be used in the construction of the road from Atkins to station No. 512, a distance of about nine miles, and also was given the contract to haul the feed for the teams of the appellant company and the oil to be used in the company's operations on that road; that the price he was to be paid for hauling the materials was to be ten cents per hundredweight from Atkins to a place called Gumlog, located about station No. 222, and was to receive for the material hauled beyond that and across Isabelle Creek to and including station No. 512 the price of fifteen cents per hundredweight; and he sublet the contract for hauling the material to Gumlog from Atkins to W. S. Liles and Tom Johnson. These parties were to haul from Atkins to station No. 126, at three cents per hundredweight and from station No. 126 to station No. 222, or south of Gumlog from Atkins, at five cents per hundredweight, giving appellee a profit of seven cents per hundredweight on the nearer haul and five cents per hundredweight on that from station No. 126 to station No. 222.

The testimony was that the contract was made first by Liles, and that Hundley, who was in charge of the construction work, informed him that Liles had declined to carry out the contract, and offered it to appellee. There was some discussion as to the price to be paid for

the hauling, but Hundley, after a consultation with Mr. Kelly, the general foreman of the work, agreed upon the prices above stated—that is, ten cents per hundredweight from Atkins out to Isabelle Creek and fifteen cents per hundredweight north of Isabelle Creek. There was no written contract entered into. Appellee proceeded with his own teams to haul north from Isabelle Creek, and completed the hauling of material, and was paid for same, but, at about the time his subcontractors began to haul, the appellant company put its own teams and trucks on the shorter hauls, and refused to permit the appellee's subcontractors to do the work. According to the evidence for the appellee, all of the material was to be delivered by the appellant company at Atkins, and appellee was to haul it from Atkins to the end of the road.

The court, in submitting the case to the jury, made the following declaration of law in instruction No. 2:

"The court tells you that as a matter of law Hundley, under the testimony in this case, was not authorized to make the character of contract that the plaintiff contends he did make with him, but that plaintiff contends that, even if Hundley did not have that authority, the bridge company knew that Hundley had made a contract giving him the exclusive privilege and right to do all of this hauling. And the court tells you that is the principal question for you to decide in this case. If the bridge company knew that Hundley, as their foreman, had—although he didn't have authority—if they knew that he had made that contract and they went on and performed parts of the contract under it, after they had knowledge that such a contract was made, the court tells you that they would be bound by the contract if they knew that Hundley had made it and went ahead and recognized the existence of the contract."

The appellant contends that there was no proof to support the allegations in the complaint relative to the items $217.30 for hauling feed and $120 for hauling oil,

and on two items for hauling gravel used in bridges, $287.27 and $166.35. We think that the appellant's contention in these particulars is correct, and that there was no substantial testimony as to amount of feed or oil used in the work or the amount of additional gravel used in bridges. As to the feed, the most that is shown by the testimony is that there were about nine sacks a day used in feeding the teams, but there was no evidence as to how long the teams were used and fed on the work nor any testimony to warrant the jury in arriving at the amount of the oil used or additional gravel, and it is evident that these items were not considered by the jury, because its verdict was for much less than the damage claimed, and less than what it might have found as damages for loss of profit on the gravel and sand hauled.

It is next contended that there is no evidence sufficient to establish with any reasonable degree of certainity the amount of sand, gravel and cement used on the road from Atkins to station No. 222 at or about Gumlog, because appellee did not know how much rock, sand, or other material he had hauled—that he didn't keep any account of it. However, there is no contradiction as to his having hauled all of the material north of Isabelle Creek to station No. 512, the end of the road, or that he was paid for it.

Watkins Hall, connected with the State Highway Department, testified in the case, and made an estimate of the quantities of material used on the highway running north from Atkins, known as No. 105, and attached to his testimony an exhibit showing the quantities of sand, gravel and cement used in the construction of the road, and also showed the amount of these materials that were used from Atkins to station No. 222, the total aggregate weight being 3,369,900 pounds, and it was this material that was to be hauled for the appellee by Liles and Johnson, to whom he had sublet his contract for that part of the haul. The testimony of Hall is nowhere contradicted, and it is evident from his testimony that he

had first-hand knowledge regarding the matters about which he testified. So, if the appellee did have a contract with the appellant, he would be entitled to his profit on the haul from Atkins to station No. 222. According to his statement, his profit would have been three cents per hundredweight from Atkins to station No. 126 and five cents per hundredweight from station No. 126 to station No. 222, but there is no testimony that we have been able to discover that would indicate just what proportion of material was hauled at a profit of three cents and how much was hauled at a profit of five cents per hundredweight to the appellee. The only way by which these amounts could be ascertained would be upon the assumption that the same proportionate amount of material was used between each station, but this assumption has no evidence to support it, and there is no warrant for the inference that the road was of the same width at every station or that the same amount of material was used. But, as appellee would have been entitled to as much as three cents per hundredweight profit for the whole amount used, if he is entitled to recover at all, the jury would have been warranted in figuring his profit on that basis, which would be in excess of its verdict.

The most serious question, however, which presents itself for our consideration is whether Hundley and Kelly, or either of them, were clothed with apparent authority to make the contract, and, if they were not, did the appellant company ratify the contract? In considering this question it is proper to take into consideration all of the circumstances surrounding the transaction. The president of the appellant company, S. C. Coddington, stated that Hundley had no authority to enter into a hauling contract for sand and gravel, *as all such contracts are required to be in writing,* and any contracts that are spread over any length of time must be in writing, and a bond is generally required, and that neither Hundley nor any other employee of the company had authority to enter into an oral contract or any other kind

of contract so as to bind the company. But he nowhere testified that Hundley did not make the contract, and there is no other testimony disputing that fact.

Russell Weil testified that he was the Arkansas manager of the appellant company, which had a contract for the construction of a bridge over the Arkansas River at Dardanelle; that, as such Arkansas manager, he had no authority to make any contracts at all except for what the company termed ''unit contracts''—that is, contracts for buying gravel or sand at so much per cubic yard, or on hauling so much per trip, or so much per ton—and if there was a longer contract made it would have to be ratified by Mr. Coddington or some officer of the corporation, and all contracts, even for the purchase of a pound of nails, would have to be in writing; that Hundley was construction foreman on the road work, and was authorized to hire and fire on the unit basis; that Mr. Kelly was in charge of the road work, and had authority over Hundley.

It is apparent from all of the testimony that Kelly and Hundley, acting under Kelly, had entire charge of the construction work on the road; and, while Coddington and Weil say they had no authority to make any contract except on the unit basis—that is, so much per day, or so much per load—they did in fact make all of the contracts for clearing the right-of-way and for hauling the material. Kelly had authority to sign checks, and did sign them, and Kelly and Hundley had authority to have the right-of-way cut, and that contract was made with the appellee, Duvall, and Coddington, the president of the appellant company, states that he does not think it was a written contract, but that contracts for clearing or grubbing could be terminated at any time. There is no testimony to show that Coddington had any active supervision over the road work, and Weil states that *he* had none; but Coddington testified that he was over on the road several times. Liles testified that Kelly had contracted with him to haul material out on the highway,

and told him he would write up the contract and leave it at a certain place and time, but it was never signed, and he (witness) concluded he could not make anything out of the contract to haul at ten cents per hundredweight clear to the end of the road, and gave up the contract. When it became apparent that Liles had abandoned his contract, Hundley approached Duvall regarding the same, and, after some negotiation, informed Duvall that he had authority from Mr. Kelly to make the contract, and that when Kelly came back they would enter into a written contract, but no contract was ever written, and appellee went to work immediately after the verbal contract was entered into. Kelly himself talked with the appellee regarding the contract for hauling material, and knew all about its execution. Kelly also told appellee that whatever Mr. Hundley did on the job was all right, and Hundley was in charge of the work when Kelly was not there. All of the witnesses testified that it was Hundley or Kelly who made the contracts, did the hiring and firing, and it seems, so far as those who did the actual work are concerned, there was no one known to be in charge of the operations except Hundley and Kelly.

The evidence shows that appellee completed, with his own teams and labor, a considerable portion of the hauling, and all of that which lay beyond Isabelle Creek, which was the longest haul and over the worst road, and that on this part of the work he lost about $600, while the haul from Atkins to Gumlog or station No. 222 was over a much better road and a much shorter haul, and that was the reason appellee was able to sublet the contract for that haul for a lesser amount than he had contracted for. As appellee had completed the long haul over a difficult road, when his subcontractors were preparing to haul material on the shorter and better haul, appellant ceased delivering material to Atkins and began procuring it at other places and transporting it to the points where it was to be used with its own equipment. We think that the circumstances of this case were sufficient to submit

to the jury the question of the apparent authority of Hundley to enter into the contract with the appellee, and the instruction heretofore quoted, given by the trial court, was more favorable to the appellant than it was entitled to.

This court, in the case of *Ozark Mutual Life Assn.* v. *Miller,* 169 Ark. 136, 273 S. W. 378, on the question of apparent authority, laid down the following rule: ''Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume, or which he holds the agent out as possessing, or such authority as he appears to have by reason of the actual authority which he has, and such as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.'' The same rule was stated in the case of *Hal H. Peel & Co.* v. *Hawkins,* 175 Ark. 806, 300 S. W. 420; and in the case of *Three States Lumber Co.* v. *Moore,* 132 Ark. 371, 201 S. W. 508, the court said: ''One dealing with an admitted agent has the right to presume, in the absence of notice to the contrary, that he is a general agent, clothed with authority coextensive with its apparent scope, and that an agent acting within the apparent scope of his authority, though in violation of specific instructions, may bind his principal in dealing with one who has no notice of the restrictions upon the agent's authority.'' On the authority of these cases, when applied to the facts hereinbefore stated, it is clear that there was some substantial testimony tending to establish the apparent authority of Hundley, and this question should have been submitted to the jury.

There is evidence that the appellant company knew that the appellee; Duvall, was engaged in hauling material, for he began hauling around the 10th of January, 1928, and continued to haul through the winter and for a considerable period of time, during all of which time the appellant company knew that he was doing the work, and, when he had completed the delivery of the material from Isabelle Creek to the end of the road, the appellant com-

pany had received the benefit of that portion of the work which would have been most expensive to it, and for which it had procured the appellee's services under the belief that he would have the work on the shortest haul and less expensive portion of the road. There is some evidence tending to show that the appellant was sufficiently acquainted with the nature and scope of appellee's work and that it received such benefit from that work as would warrant the submission to the jury of the question of the ratification of the contract, even though it had been unauthorized and made by one who had no apparent authority.

It is well settled that a principal who accepts the benefits of an unauthorized act of a reputed agent cannot afterward deny the agency. *Daniels* v. *Brodie,* 54 Ark. 216, 15 S. W. 467; *Coffin* v. *Planters' Cotton Co.,* 124 Ark. 360, 187 S. W. 309; *Froug, etc. Co.* v. *Outcault Advertising Co.,* 114 Ark. 9, 168 S. W. 1075.

It is true, ordinarily, in order that the principal will be deemed to have ratified the unauthorized acts of an agent, he must have had knowledge of all material facts, and ignorance of such facts will render an alleged ratification ineffectual; but, where a benefit accrues to the principal from the unauthorized acts of his agent, then he is charged with such knowledge, if, from all of the circumstances in the case, he knew or could have known the purposes and intentions of his agent and the persons with whom such agent was acting. *Pharr* v. *Southern Arkansas O. & G. Co.,* 152 Ark. 567, 240 S. W. 407.

In this case it was admitted that Hundley and Kelly were the agents of appellant company and clothed with a limited authority in the prosecution of the work over which they had charge, but this limitation was not known to the appellee. Nowhere do the officers of the appellant company say that this contract was entered into without their knowledge, and it is clear that Coddington, president of the appellant company, knew that a material part of the work and the most difficult and

972

expensive part was being performed by the appellee Duvall. In the light of these circumstances, it was clearly a question for the jury as to whether or not the appellant had ratified the acts of its foreman. *Kerby* v. *Road Imp. Dist. No. 4*, 159 Ark. 201, 251 S. W. 356.

As has been stated, the error committed by the trial court was not such as was prejudicial to the appellant company. First, the testimony is undisputed that there was a contract entered into; second, there is some substantial testimony to show that Hundley had apparent authority to make the contract; third, that it was ratified; and fourth, that the evidence shows with a reasonable degree of certainty that the appellee was entitled to damage in an amount equal to the verdict.

The judgment must therefore be affirmed.